JUDGE HOLWELL



DANIEL J. KAISER [DK-9387]
KAISER SAURBORN & MAIR, P.C.
ATTORNEYS FOR PLAINTIFF
111 BROADWAY, SUITE 1805
NEW YORK, NEW YORK 10006
(212) 338-9100

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

BRIAN ANTHONY MARTINEZ,                                    Civil Action No.:

              Plaintiff,

       -against-                                           COMPLAINT

BLOOMBERG LP,  ANDREW LACK, individually                  JURY TRIAL DEMANDED
and as CEO of Bloomberg LP's Multimedia Division,
CATRIONA HENDERSON, individually and as
Bloomberg LP's Regional Head of Human Resources,

              Defendants.
------------------------------------------------------------X

       Plaintiff, Brian Anthony Martinez, by his attorneys, Kaiser Saurborn & Mair, P.C., as and

for his complaint against defendants, alleges as follows:

## PARTIES, JURISDICTION, AND NATURE OF ACTION

       1.     Plaintiff, Brian Anthony Martinez ["Martinez" or "plaintiff"], is a former

employee of Bloomberg LP.

       2.     Defendant, Bloomberg LP  ["Bloomberg" or "defendant"], is a privately held

financial software, media, and data company duly authorized to conduct business in the State of

New York and has its principal place of business at 731 Lexington Avenue, New York, NY

10022.

       3.     Defendant, Andrew Lack ["Lack" or "defendant"], is CEO of  Bloomberg's

1

Multimedia Division.

4.     Defendant, Catriona Henderson ["Henderson" or "defendant"], is Bloomberg's UK Regional Head of Human Resources.

5.     This action seeks compensatory and punitive damages for defendants' violations of the Americans with Disability Act [42 U.S.C. § 12111, *et seq.*], Executive Law 296, *et seq.*, and New York City Administrative Code 8-502 (a), *et seq.* Mr. Martinez was terminated because defendants incorrectly perceived and regarded him to be disabled in a manner that rendered him unable to perform his job responsibilities for Bloomberg. Further, Mr. Martinez was terminated because he is gay.

6.     Original jurisdiction of this Court is founded upon 28 U.S.C. § 1331 and § 1332 (a), *et seq.*, in that this is a civil action wherein the matters in controversy arise under the laws of the United States. This court has pendent jurisdiction over plaintiff's New York State and New York City law claims.

7.     This Court has personal jurisdiction over the defendants named in the complaint pursuant to 31 U.S.C. § 3732 (a) because the defendants conduct business in this district and because an act proscribed by 29 U.S.C. § 2615 occurred within this district.

8.     Venue in this Court is proper under 28 U.S.C. §§ 1391 (b) and (c) and 31 U.S.C. § 3732 (a) because the defendant does business in this district and some of the events or omissions giving rise to the violations of 29 U.S.C. § 2615 alleged in the complaint occurred in this district.

9.     This complaint is filed within 90 days of the issuance of the Notice of Right to Sue by the Equal Employment Opportunity Commission.

## BACKGROUND

## I.

## MR. MARTINEZ'S EMPLOYMENT

10.     In April 2000, Mr. Martinez commenced full time employment with Bloomberg as a Producer assigned to special projects employed by the company's New York office.

11.     He had worked on a freelance basis for Bloomberg since September 1999.

12.     In May 2001, he accepted a temporary assignment to Tokyo to consult on projects in Asia. He remained in Tokyo until 2005 at which time he was reassigned to Bloomberg's London office.

13.     During the entire time of his overseas Bloomberg work assignments, he remained entitled to certain U.S. employment benefits such as 401K contributions, international private health insurance for U.S. expatriates, and tax filing assistance.

14.     Also, he continued to pay U.S. federal and New York State taxes.

15.     Mr. Martinez worked as an expatriate for Bloomberg and home base for Mr. Martinez's Bloomberg employment always remained New York City.

16.     During the tenure of his Bloomberg employment, Mr. Martinez was repeatedly promoted to positions of increasing responsibility and, correspondingly, awarded substantial pay increases.

17.     In January 2010, he was promoted to Bloomberg Television International Managing Director, EMEA & Asia.

18.     In October 2010, plans were initiated to incorporate Brazil and any future activities in Latin America under Mr. Martinez's supervision.

19.     Noteworthy, Mr. Martinez's job performance evaluated in written performance evaluations was consistently rated "exceptional."

20.     In short, Mr. Martinez is an exceptional talent widely recognized in his industry who created tremendous value for Bloomberg. The impressive trajectory of his Bloomberg career speaks for itself.

21.     In November 2010, however, Mr. Martinez's career hit a brick wall. Suddenly, his talent and obvious value to the company no longer mattered to Bloomberg because the company mis-perceived him as an employee who was mentally unfit to work. Bloomberg's senior managers concluded that Mr. Martinez was psychiatrically disabled as a result of a violent encounter he had with his domestic partner which additionally highlighted, to Bloomberg's displeasure, his sexual orientation status as a gay man.

**Defendants' Discriminatory Conduct**

22.     In October 2010, Mr. Martinez, a gay male, revealed that he had been for the past several months the victim of physical abuse committed by his domestic partner.

23.     In Mid-October 2010, he arranged a meeting with Ms. Henderson and reported to her that his partner had been violent towards him.

24.     Later the same day, Mr. Martinez was examined by a General Practitioner, employed by Blossoms Healthcare [Bloomberg's GP Services-Occupational Health Care provider].

25.     Shortly after, Mr. Martinez spoke by telephone with defendant, Mr. Lack.

26.     Mr. Lack promised to meet one-on-one with him during Mr. Martinez's upcoming business trip to New York. Due to timing constraints, the meeting did not occur.

4

27.    On November 29, 2010, Mr. Martinez was referred to a psychologist for treatment.

28.    Later the same day, Mr. Lack called and stated that he knew the details of what happened to Mr. Martinez and was coming to meet with him.

29.    On November 30, 2010, he met with Mr. Lack.  Mr. Lack insisted that Mr. Martinez take time off.

30.    While Mr. Martinez already had planned an annual leave from December 16, 2010 until January 3, 2011, as a consequence of his supervisor's insistence, he began an unofficial leave of absence beginning November 29.

31.    He continued, however, to do some work from home.

32.    During his leave, Mr. Martinez also faithfully continued to keep appointments with medical professionals treating his medical condition.

33.    While the physical abuse had plainly taken an emotional toll, causing some depression and anxiety, Dr. Henrietta Bowden-Jones, his psychologist, noted Mr. Martinez's underlying strength and resilience and remarked to him that after some time off, that he was perfectly capable of resuming work and that continued employment was the best thing for him.

34.    In mid-December, Mr. Martinez was given his annual review conducted via telephone by Mr. Lack.

35.    While he was rated "Exceptional," his bonus was not consistent with either Bloomberg's historical pay practice or his 2010 contribution. Further, just the month prior, in part recognizing Mr. Martinez's value, Mr. Lack told Mr. Martinez and other managers that Latin

America would be added to Mr. Martinez's work responsibilities.

36.     Mr. Martinez returned to work on January 4, 2011. Upon his return, he addressed his concerns regarding his bonus to Ms. Henderson.

37.     He noted to her that other lower level Bloomberg managers reporting directly to him who had received lower ratings received higher percentage bonuses than he did, more in keeping with Bloomberg's historical pay practice.

38.     Ms. Henderson's only reply was to advise Mr. Martinez to raise the issue with Mr. Lack.

39.     No Bloomberg manager at any time substantively discussed the bonus issue with Mr. Martinez.

40.     While Mr. Martinez experienced some challenges balancing personal [relating to the purchase of a new home] and work stresses during the month of January, he performed his job functions with little difficulty.

41.     His job performance did not in any manner or respect suffer, and nobody complained to him that his work effort was sub-par.

42.     On February 14, 2011, Ms. Henderson requested that Mr. Martinez attend a meeting with her and Mr. Lack.

43.     During the meeting, Mr. Lack expressed concern that Mr. Martinez was unwell.

44.     Mr. Lack conceded that his performance had not suffered to date but that he was concerned that his "personal life" issues would interfere with his future performance.

45.     Mr. Martinez inquired whether his "concern" had anything to do with the personal issues he dealt with at the end of last year, and Mr. Lack acknowledged that he believed Mr.

Martinez was still struggling with those personal issues.

46.     While Mr. Martinez attempted to assure him that was not the case, Mr. Lack remained unpersuaded.

47.     Mr. Lack and Ms. Henderson both suggested to Mr. Martinez that the fact that he had been victimized in a domestic abuse incident seriously impacted his ability to perform his job responsibilities.

48.     Defendants had absolutely no evidence that Mr. Martinez's work responsibilities were in any manner or respect compromised by the domestic abuse incident or that his general psychological or emotional state rendered him unfit to carry out his work responsibilities.

49.     Defendants conclusion that Mr. Martinez was unfit for work constituted a stereotypical determination unlikely to be applied to a employee in a heterosexual relationship in similar circumstances.

50.     Ms. Henderson recommended that he take time off through the Employee Assistance Program for at least thirty days.

51.     It was evident to Mr. Martinez that he had no choice but to accept this suggestion for a medical leave despite his personal view that it was unnecessary.

52.     At this point, Mr. Martinez was deeply concerned that Bloomberg's senior managers had formed a mis-impression of his medical condition and its impact upon his ability to work and, even more disturbing, that these same senior managers were now troubled by his same-sex relationship that resulted in the violence towards him in October 2010.

53.     Mr. Martinez began his medical leave on February 15, 2011.

54.     On March 25, 2011, Dr. Bowden-Jones cleared Mr. Martinez to return to work by

7

April 1, 2011.

55.     Despite this unambiguous medical clearance to return to work, Ms. Henderson in a meeting with Mr. Martinez on April 1 advised him that she and Mr. Lack were thinking that Mr. Martinez would be out for at least three months and that it may be better for him not to return until May.

56.     Ms. Henderson, a senior Human Resources professional, demonstrated a remarkably callous disregard for the professional medical opinion of Mr. Martinez's doctors, betraying that Bloomberg had an alternative agenda regarding Mr. Martinez's employment that had nothing to do with his health or his fitness to return to his job.

57.     While on leave, Mr. Martinez began to receive information from various Bloomberg colleagues that organizational changes were being considered that related to his position.

58.     He was consulted about none of these issues.

59.     Indeed, in March, Asia was entirely removed from Mr. Martinez's area of responsibility.

60.     Mr. Lack confirmed in writing that this decision to reduce Mr. Martinez's role within Bloomberg was permanent. In short, defendants were engaged in a calculated and transparent effort to marginalize Mr. Martinez.

61.     Through April and May, defendants continued to delay any substantive discussion of Mr. Martinez's return to work despite his assurances and those of his doctors that he was fit to return.

62.     Ironically, it was defendants' discriminatory and antagonistic behavior towards Mr.

Martinez that became the principal cause of anxiety and stress for him.

63.     Nevertheless, despite Bloomberg's hostility towards him, he remained committed to his job and his full time return to it.

**Defendants Unlawfully Terminate Mr. Martinez**

64.     Bloomberg's discrimination culminated in a June 20, 2011 letter to Mr. Martinez in which he was advised that Bloomberg was considering a restructuring that could "regrettably result in the elimination of your role and therefore your being made redundant."

65.     On July 29, 2011, Mr. Martinez was terminated.

66.     The explanation provided for Mr. Martinez's termination was an obvious pretext for unlawful discrimination.

67.     No legitimate non-discriminatory reason existed, nor was any legitimate non-discriminatory reason communicated to Mr. Martinez, for his termination.

68.     Mr. Martinez was terminated because 1) defendants regarded him as disabled in a manner that interfered with major life activities, including, but not limited to, plaintiff's ability to perform his work responsibilities and 2) further because he is a gay male.

69.     At all relevant times, plaintiff remained ready and able to perform all of his work responsibilties.

70.     Defendants' discrimination has impacted Mr. Martinez's New York Bloomberg employment by ending his Bloomberg career and preventing him from returning from assignment to Bloomberg's home New York City offices.

71.     Upon information and belief, defendants acted maliciously and/or in reckless disregard of plaintiff's civil rights.

## CAUSE OF ACTION I

72.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "71" of the complaint with the same force and effect as if separately alleged and reiterated herein.

73.     Defendant, Bloomberg, unlawfully terminated plaintiff because it regarded him as disabled and unable to perform his work responsibilities.

74.     By reason thereof, defendants have violated the Americans with Disabilities Act [ADA, 42 U.S.C. § 12111, *et seq.*], and plaintiff has been damaged in an amount to be determined at trial, including, but not limited to, lost past and future earnings, other employment benefits, job search costs and expenses, other financial consequences, and emotional injuries.

## CAUSE OF ACTION II

75.     Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "71," and "73" of the complaint with the same force and effect as if separately alleged and reiterated herein.

76.     Defendants discriminated against plaintiff because he was regarded as disabled and because of his sexual orientation.

77.     By reason thereof, defendants have violated Executive Law § 296, *et seq.*, and as a consequence, plaintiff has been damaged in an amount to be determined at trial, including, but not limited to, lost past and future earnings, other employment benefits, job search costs and expenses, other financial consequences, and emotional injuries.

## CAUSE OF ACTION III

78.     Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through

"71," "73," and "74" of the complaint with the same force and effect as if separately alleged and reiterated herein.

79.   Defendants discriminated against plaintiff because he was regarded as disabled and because of his sexual orientation.

80.   By reason thereof, defendants have violated New York City Administrative Code 8-502(a), *et seq.*, and as a consequence, plaintiff has been damaged in an amount to be determined at trial, including, but not limited to, lost past and future earnings, other employment benefits, job search costs and expenses, other financial consequences, and emotional injuries.

**WHEREFORE,** plaintiff demands judgment against defendants as follows:

(i)     On the First Cause of Action assessing compensatory and punitive damages in an amount to be determined at trial;

(ii)    On the Second Cause of Action assessing compensatory damages in an amount to be determined at trial;

(iii)   On the Third Cause of Action assessing compensatory and punitive damages in an amount to be determined at trial

(iv)    Reinstatement;

(v)     Attorney fees and disbursements; and

(vi)    For such other relief as the Court deems just and proper.

11

**PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY**

Dated: New York, New York
      October 24, 2011

KAISER SAURBORN & MAIR, P.C.

By: _____
      Daniel J. Kaiser, Esq. [DK-9387]

Attorney for Plaintiff
111 Broadway, Suite 1805
New York, New York 10006
(212) 338-9100